UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| DEBORAH A. TOBACCO, <br><br> Plaintiff, <br><br><br> vs. <br><br> AVERA MCKENNAN d/b/a AVERA RESEARCH INSTITUTE, <br><br> Defendant. | 5:23-cv-5032 <br><br><br><br><br> **COMPLAINT** <br> **WITH JURY TRIAL DEMANDED** |

COMES NOW Plaintiff Deborah Tobacco, and for her Complaint for race discrimination in employment against Defendant Avera McKennan d/b/a Avera Research Institute, alleges and states as follows:

## JURISDICTION, VENUE AND THE PARTIES

1.    The Plaintiff's race discrimination claim arises under Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e *et seq.* ("Title VII"). As such, this Court has original jurisdiction to hear this Complaint and to adjudicate the claims stated in this Complaint pursuant to 28 U.S.C. § 1331.

2.    Plaintiff's additional claim against her former employee under the South Dakota Human Relations Act, S.D.C.L. § 20-13-1 et seq., and South Dakota common law. Supplemental jurisdiction is proper for such claims pursuant to 28 U.S.C. § 1367.

3.    Venue is proper under 28 U.S.C. § 1391 because the events and omissions giving rise to the claims occurred within the geographic boundaries of the Western Division of the United States District Court of South Dakota.

4. Deborah Tobacco ("Tobacco") is an adult Native American who resides in Oglala Lakota County, South Dakota.

5. Avera Research Institute ("ARI") is a division of Avera McKennan ("Avera"). Avera operates ARI with approximately 60 employees throughout three offices located in Sioux Falls, Rapid City and Pine Ridge, South Dakota.

6. Avera hired Tobacco at its office in Pine Ridge on the Pine Ridge Indian Reservation.

7. At all relevant times, Avera was an "employer" within the meaning of 42 U.S.C. § 2000e(b) and SDCL § 20-13-1(7).

8. At all relevant times, Plaintiff was an "employee" of Avera within the meaning of 42 U.S.C. § 2000e(f) and SDCL § 20-13-1(16).

9. Following her discharge from employment on July 5, 2022, Tobacco timely filed a Charge of Discrimination with the EEOC and the South Dakota Division of Human Rights alleging race discrimination in the terms and conditions of her employment.

10. The EEOC issued Tobacco a Right to Sue Notice on February 27, 2023, and the South Dakota Division of Human Rights closed its file as its final agency action on February 28, 2023.

## FACTUAL ALLEGATIONS

11. Avera operates ARI, which is a community-based research entity that conducts studies to allow insight into historically underserved populations, and it expresses a particular dedication to researching American Indian health issues.

12. ARI maintains offices in Sioux Falls, Pine Ridge, and Rapid City, and it describes its services as follows:

2

Avera Research Institute - Pine Ridge

Avera Research Institute and Lakota communities work together to improve
health for American Indians in our region. Our partnership and collaboration
with the Oglala Sioux Tribe assists in various studies to improve Plains
Indians' health. We have partnered with them on an intervention study, infant
care sleep practices, and community building on the reservation.

This expert research team is led by Amy Elliott, PhD, and has offices in Sioux
Falls, Pine Ridge and Rapid City, SD.

See  https://www.avera.org/locations/profile/avera-research-institute-pine-ridge/
(5/2/2023).

13.    Avera's employment policies expressly prohibit race discrimination in employment.

14.    Avera's affirmative action employment policies states that it will take affirmative
action to seek out qualified applicants without regard to race or other protected statute.

15.    Avera's affirmative action policy states that "[a]t Avera, all terms and conditions of
employment are, and will continue to be, established on the basis of an individual's
qualifications and ability to perform the job."

16.    Dr. Amy Elliot ("Elliot") was previously the director of the Sanford Center for
Health Outcomes and Prevention Research.  In December 2017, Elliot left Sanford's research
entity and was hired by Avera as ARI's chief clinical research manager at ARI.

17.    Between 2012 and 2017, Tobacco worked with Elliot at Sanford as its Research
Manager in its Pine Ridge location.  When Elliot joined ARI, she recruited Tobacco to come
work for ARI.

18.    On December 11, 2017, Avera hired Tobacco in the role of ARI's Clinical Research
Manager at Avera's Pine Ridge office.

19.    Avera used Tobacco's race as a factor in its hiring process because of its
perceptions that her race would make her qualified to connect with Native American research

3

study participants, and for the appearance of including a Native American person on its management team.

20. During her employment with Avera, Tobacco performed her job in a manner that met Avera's expectations.

21. Some ARI managers treated Tobacco as a token manager in many respects of her written job duties, and they treated Tobacco differently in other conditions of her employment.

22. During the Covid -19 pandemic, ARI provided Tobacco and its other Native American staff member in its Pine Ridge office with homemade masks that had to be washed and re-used, while its Caucasian staff members were provided with disposal, medical grade masks. Tobacco complained and repeatedly requested to be provided with medical grade masks several times before ARI provided the safer and better fitting masks.

23. Despite her title as a manager at ARI, some ARI managers limited Tobacco in her ability to perform the major communications functions of the managerial position that it described in its written job description, and they assigned those components of her job to other Caucasian ARI managers.

24. During Tobacco's employment at ARI, some ARI managers used race as a factor in the selection of lead clinical research manager positions and only hired Caucasian people for those job roles.

25. When she began her employment at ARI, Tobacco requested that she be named as the lead Clinical Research Manager for ARI's Infant Care Practice Study.

26. ARI used race as a factor in the decision that Tobacco would not be appointed to the lead Clinical Research Manager for ARI's Infant Care Practice Study position. Specifically, an ARI manager told Tobacco that Tobacco would not be named to the position because it would

4

be a "conflict of interest" to have that role because Tobacco is Native American. The person ARI selected for the lead Clinical Research Manager of the Infant Care Practice Study was a Caucasian person.

27. Between 2021 and 2022, Tobacco observed that ARI had advertised several positions in the Rapid City area.

28. A qualified Native American applicant told Tobacco that she had twice applied for an open ARI position in Rapid City but was not granted an interview.

29. When Tobacco asked to see the list of applicants for the position, she was ignored.

30. To the best of Tobacco's knowledge, ARI did not hire any Native American applicants for the advertised positions.

31. In 2020, Dr. Ariel Deutsch ("Deutsch") left employment at a Sanford research entity and joined Avera's ARI team in a managerial role. A primary focus of Deutsch's work at Avera was in the ARI Community Based Systems Dynamics Models of Alcohol and Substance Exposed Pregnancy Northern Plains American Indian Women Group Based Modeling study (aka SYNCH).

32. When Deutsch was hired at ARI, Tobacco and other ARI managers were told that that the SYNCH study had already been in progress in Rapid City for five (5) years.

33. After ARI undertook the SYNCH study, the SYNCH study suffered from a lack of participants, and the validity of the study data was coming into question between the two site locations of Rapid City, SD and Pine Ridge, SD.

34. After joining ARI, Deutsch became frustrated that the ARI Rapid City office staff was struggling to recruit participants for the SYNCH study.

5

35. When Tobacco offered suggestions about ways that the Rapid City staff could recruit more participants to the study, Ellis told Tobacco that Tobacco was being named as the lead Clinical Research Manager for the SYNCH study for both ARI's Rapid City and Pine Ridge offices.

36. ARI used race as a factor to select Tobacco as the lead Clinical Research Manager for the SYNCH study in its Rapid City office, which was a job that Tobacco had not applied for.

37. ARI also assigned its only other Native American employee in its Pine Ridge office to work on the SYNCH study in both its Rapid City office as well as continuing to perform his job duties in its Pine Ridge office. To the best of Tobacco's knowledge, this employee had not applied for the additional job that ARI assigned him to either.

38. ARI provided a vehicle to Tobacco and her co-worker from the Pine Ridge office so that they could drive to attend their assigned SYNCH duties in its Rapid City office.

39. Tobacco's ARI manager instructed Tobacco and her co-worker that they had to carefully log all mileage for the vehicle, including if they drove a couple of blocks out of the way to mail items at the local post office.

40. Tobacco had seen other ARI employees' and an intern's mileage logs, so she was aware that ARI employees and interns who were not Native American did not have to log the same level of detail that was required of Tobacco and her Native American co-worker.

41. When Tobacco arrived at the ARI Rapid City office to assume her new management role, the person who had previously been the lead clinical research manager for the SYNCH study in ARI's Rapid City office was still working for ARI and did not acknowledge that Tobacco had been named as the new lead clinical research manager for the Rapid City office's SYNCH study. This ARI manager treated Tobacco as a subordinate employee.

42.    When Tobacco reported to Deutsch that the previous lead clinical research manager for the Rapid City SYNCH study was assigning Tobacco duties and was not accepting Tobacco's managerial or leadership role, ARI did not investigate Tobacco's report of insubordinate behavior.

43.    Because individual contact with participants is one of the most effective study participants recruitment methods, Tobacco direct ARI employees in its Rapid City office to recruit SYNCH study participants directly by knocking on doors and visiting individual residences.

44.    When Tobacco investigated why recruitment of participants for the Rapid City SYNCH study remained stagnant, Tobacco learned that ARI Employee A and Employee B, whose job it was to recruit participants to the SYNCH study in Rapid City, were refusing to go out into the community to directly recruit SYNCH study participants.

45.    Employee A and Employee B, who are not Native American, refused to perform direct recruitment of Native American families in Rapid City and stated that it was because it was "too dangerous," and they had generalized fears that they might be shot or attacked if they went into predominately Native American neighborhoods.

46.    Initially Tobacco explained to Employee A and Employee B that they were relying upon a racial stereotype about Native Americans, and she tried to empower Employee A and Employee B to do their job duties by suggesting that Employee A and Employee B could work in a team, could set specific hours when they would go door-to-door, or could even have ARI provide them with self-defense training.

47.    Employee A and Employee B ignored Tobacco's suggestions and continued to refuse to follow her directive to engage in direct study participant recruitment.

48.   Tobacco reported to ARI's Rapid City site manager that Employee A and Employee B were refusing to perform their job duties because of offensive, racially motived stereotypes. Tobacco pointed out that she had suggested that the employees could work in teams, have specific hours for door-to-door recruitment, or to be provided them with self-defense training so that they would feel safe and perform their job duties.

49.   The ARI Rapid City site manager did not address or investigate Tobacco's report about racially discriminatory behavior by Employee A and Employee B.

50.   In the meantime, Employee A and Employee B continued to refuse to perform their recruitment duties as directed by Tobacco.

51.   When Employee A and Employee B continued to refuse to follow her directives about their job duties, Tobacco complained to Deutsch that Employee A and Employee B were relying upon racial stereotype to refuse to follow her directives, and Tobacco requested that ARI should discipline these employees or terminate them if they would not  perform their assigned job duties.

52.   Deutsch responded that she was "starting to think" that the reason Employee A and Employee B would not do their assigned job duties was discriminatory.

53.   However, ARI did not investigate Tobacco's complaint, and it took no action to address Employee A and Employee B's refusal to perform their job duties, their failure to follow Tobacco's directives as a manager, or their reliance upon racially discriminatory stereotypes as the basis for their refusal to perform their job duties.

54.   Instead Deutsch said that Tobacco was not properly supervising Employee A and Employee B because Tobacco was not listening to their concerns. Deutsch then assigned

Tobacco and ARI's other Native American employee to perform the door-to-door recruitment that Employee A and Employee B refused to do.

55. ARI used race as a factor when some of its managers determined that door-to-door recruitment techniques were too dangerous for its Caucasian staff members but was safe enough to assign as a job duty for its Native American employees.

56. After Tobacco had unsuccessfully urged her supervisors to try education or disciplinary action for Employee A and Employee B, Deutsch began to refer to "fucking white people" and referred to a co-worker as a "white bitch" when she talked with Tobacco.

57. Deutsch's racially offensive comments directly violated Avera's anti-discrimination policies and highlighted her focus upon Tobacco's race.

58. In addition to performing Employee A and Employee B's door-to-door recruitment duties, Ellis had also assigned Tobacco to enter SYNCH Study data that Deutsch had compiled during the previous four (4) years. Deutsch repeatedly refused to provide Tobacco with the data, saying that the data was "in her head" and that she would enter it herself.

59. Tobacco was unsure if Deutsch's refusal to produce the data was an effort to make Tobacco fail at her job or if Deutsch did not have the supportive data anyplace but in her memory.

60. Because Tobacco was identified as the person responsible for the accurate entry of the SYNCH data, Tobacco advised Deutsch and another ARI supervisor that Deutsch's missing data should be reported as a deviation in accordance with National Health Institute research regulations.

61. Deutsch and ARI management ignored Tobacco's complaint about the possible study deviation, and Deutsch was not required to identify any deviation regarding the data that she told Tobacco she had stored "in her head."

62. The result of Tobacco's attempt to comply with study protocols was that Deutsch began to ignore communications from Tobacco.

63. In 2022, an ARI manager demanded that Tobacco obtain an Oglala Sioux Tribal leader's signature on a letter that ARI had prepared. When Tobacco expressed she did not think that she obtain the signature because the Tribe had not had proper input about the statements made in the letter, the ARI manager threatened her with a reprimand and directed Tobacco to find "anyone off the street" to sign the grant proposal because ARI only needed the letter to show the funding agency that "Pine Ridge wants this."

64. Tobacco complained to Avera HR about the ARI manager's threat of reprisal when Tobacco refused to ignore ARI protocol, and how it was affecting her job. No investigation was instituted as a result of Tobacco's complaint.

65. After Tobacco reported the ARI manager's directive that she should "get anyone off the street" to sign a letter in support of an ARI grant proposal, ARI managers began to exclude Tobacco from staff meetings about study projects that Tobacco was directly involved with.

66. In response to Tobacco's complaint, Deutsch acknowledged to Tobacco that Deutsch was aware that Tobacco was being treated differently by other ARI managers.

67. Deutsch told Tobacco that Tobacco needed to get the letter of grant support signed by a Tribal official. Tobacco again protested because the letter inaccurately described the information that had been provided to an considered by the Tribe, and added that obtaining the signature was difficult because the Tribe was in a transitional period in terms of leadership as the

result of a recent election. Deutsch instructed Tobacco to take advantage of the "chaos" and get the letter signed.

68. Tobacco's managers directed Tobacco to take steps contrary to ARI's written policies and to take advantage of a post-election transition period or "chaos" in order to obtain a signature on a letter that represented the Oglala Sioux Tribe's support of an ARI grant projects without having substantive discussion with the Tribe about this representation.

69. Despite Avera's written policies and the stated ARI mission, ARI tolerated or ignored its employees' racial stereotypes about Native American individuals and leaders, and allowed its non-Native American employees to have preferential terms and conditions of employment.

70. On July 5, 2022, HR and Elliott called Tobacco at the beginning of the work day to notify her that her position was being reduced as a part of reduction in force due to budgeting at Avera.

71. At the same time that Tobacco was being terminated for the stated reason of a budgetary reduction, Tobacco observed that ARI was continuing to advertise for open positions, including jobs for clinical research management in its Rapid City, SD office.

72. Even though it had open positions, when Tobacco inquired whether she had any options about whether she could decline or accept her termination, ARI advised Tobacco that she did not have any options except that she would receive severance pay.

### CAUSES OF ACTION

### COUNT I
### Race Discrimination in Violation of Title VII
### of the Civil Rights Act of 1964

73. Plaintiff incorporates the foregoing paragraphs by reference.

74. 42 U.S.C. § 2000e-2(a)(1) provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race …. "

75. Defendant subjected Plaintiff to different terms and conditions of employment in terms of her promotional and employment opportunities, job assignments, raises, and termination than employees who were not Native American.

76. Plaintiff's race played a part in the Defendant's employment decisions regarding Plaintiff's terms and conditions of employment. Defendant's conduct described herein violates 42 U.S.C. § 2000e-2.

77. Defendant provided a pretextual reason for Plaintiff's termination.

78. As a result of Defendant's conduct as described above, Plaintiff has suffered and will continue to suffer past and present loss of income, vocational loss, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation and other damages.

79. Defendant committed the above-alleged conduct with reckless disregard and/or deliberate disregard for Plaintiff's rights and safety.

## COUNT II

### Race and National Origin Discrimination in Violation of The South Dakota Human Relations Act

80. Plaintiff incorporates the foregoing paragraphs by reference.

81. The South Dakota Human Relations Act of 1972 makes it an unfair or discriminatory practice to discharge and employee or refuse to hire and applicant because of race, color or national origin.

82. Defendant subjected Plaintiff to different terms and conditions of employment in terms of her promotional and employment opportunities, job assignments, raises, and termination than employees who were not Native American.

83. Plaintiff's race played a part in the Defendant's employment decisions regarding Plaintiff's terms and conditions of employment.

84. Defendant's conduct described above violates S.D.C.L. § 20-10-13.

85. Defendant provided a pretextual reason for Plaintiff's termination.

86. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past and present loss of income, vocational loss, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation and other damages.

87. Defendant committed the above-alleged conduct with reckless disregard and/or deliberate disregard for Plaintiff's rights and safety.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Deborah Tobacco prays for judgment against Defendant Avera McKennan as follows:

A.      That the practices of Defendants complained of in this Complaint be determined to violate the rights secured to Plaintiff under Title VII, the South Dakota Human Relations Act, and South Dakota common law;

B.      For all relief available to Plaintiff, including compensatory relief and damages arising from loss of past and future income, benefits, emotional distress, and other damages, with interest on such amounts, as allowed by law;

C.      For punitive damages as allowed by law;

D.      For Plaintiff's attorneys' fees, costs and disbursements incurred in enforcing her legal rights as allowed by law;

E.      For a jury trial on all issues;

F.      For such further and other relief as the Court deems just and equitable.

13

Dated this 22nd day of May, 2023.

**JOHNSON POCHOP & BARTLING LLP**

Stephanie E. Pochop
405 Main Street
Gregory, SD 57533
Telephone: (605) 835-8391
Facsimile: (605) 835-8742
Stephanie@Rosebudlawyers.com

AND

**JOHNSON POCHOP & BARTLING LLP**

 s/Gavin Pochop
Gavin Pochop
P.O. Box 2479, 315 S. Phillips Ave
Sioux Falls, SD  57101
Telephone: (605) 835-8391
Facsimile: (605) 835-8742
Gavin@Rosebudlawyers.com

***Attorneys for Plaintiff Deborah Tobacco***

14

JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Deborah A Tobacco

**DEFENDANTS**
Avera McKennan d/b/a Avera Research Institute

**(b)** County of Residence of First Listed Plaintiff   Oglala Lakota County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Minnehaha County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stephanie E. Pochop Johnson Pochop & Bartling
405 Main Street | PO Box 149 Gregory, SD 57533
(605) 835-8391

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**     **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability    ☐ 367 Health Care/ | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &    Pharmaceutical Slander    Personal Injury | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability    ☐ 368 Asbestos Personal ☐ 340 Marine    Injury Product ☐ 345 Marine Product    Liability | | ☐ 840 Trademark ☐ 880 Defend Trade Secrets | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability    **PERSONAL PROPERTY** ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | **LABOR** | Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Product Liability    ☐ 380 Other Personal | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage Injury    ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury -    Product Liability Medical Malpractice | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment    ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 245 Tort Product Liability | Accommodations    ☐ 530 General | | | Agency Decision |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty Employment    **Other:** | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other Other    ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education    ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e seq: (Title VII)
Brief description of cause:
Race Discrimination in employment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
May 19, 2023

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____