UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| DEBORAH A. TOBACCO,<br><br>              Plaintiff,<br><br><br>     vs.<br><br>AVERA MCKENNAN d/b/a AVERA RESEARCH INSTITUTE,<br><br>              Defendant. | 5:23-CV-05032-CCT<br><br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

This order addresses the motion for summary judgment filed by Defendant Avera McKennan d/b/a Avera Research Institute (ARI), seeking dismissal of Plaintiff Deborah Tobacco's claims of race discrimination related to her employment and termination. Docket 20.

## BACKGROUND

The parties agree on many factual allegations; however, where there are disputes, the Court states the facts in a light most favorable to Tobacco, the nonmoving party. *See Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 918 (8th Cir. 2014) (noting that the Court is to "review the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party" (citation omitted)).

ARI is a research institute with Avera McKennan, and ARI has offices in Sioux Falls, Rapid City, and Pine Ridge. Docket 30 ¶ 14; Docket 31 ¶ 1. ARI

1

works together with Lakota communities "to improve health for American Indians in our region[,]" and ARI has "partnered with them on an intervention study, infant care sleep practices, and community building on the reservation." Docket 1 ¶ 12 (citation omitted); Docket 30 ¶ 13. ARI is largely grant funded. Docket 30 ¶ 16; Docket 31 ¶ 1. While almost all employee wages come from grant funds, ARI receives internal funding for leadership positions. Docket 31 ¶¶ 2–3.

On December 11, 2017, ARI hired Tobacco as a clinical research manager to work primarily in Pine Ridge. Docket 1 ¶¶ 18, 23; Docket 31 ¶ 4. Tobacco is Native American, resides in Pine Ridge, and "adheres to many traditional Lakota practices[.]" Docket 30 ¶ 20. Prior to being hired by ARI, Tobacco worked at Sanford as a research manager in Pine Ridge. *Id.* ¶¶ 21–22. Tobacco left Sanford to work at ARI because Dr. Amy Elliott, who had worked with Tobacco at Sanford, recruited her to ARI. *Id.* ¶ 22. Dr. Elliott is ARI's chief clinical research officer. *Id.* ¶ 18.

Tobacco claims that her race was "a factor in [ARI's] hiring process because" ARI perceived "that her race would make her qualified to connect with Native American research study participants, and for the appearance of including a Native American person on its management team." Docket 1 ¶ 19; Docket 30 ¶ 23; Docket 32-1 at 31, 32.[1] According to Tobacco, she provided information to ARI about the Lakota culture. Docket 32-8 at 45. She further

---

[1] The page numbers cited for deposition testimony throughout this order will be the page numbers as indicated on the pages of the deposition exhibit, not the docket page numbers.

notes Dr. Elliott's testimony recognizing that Tobacco assisted ARI with bringing in people that are able to conduct cultural training at ARI and that Tobacco interfaced with tribal leaders while managing the Pine Ridge office. Docket 30 ¶ 27; Docket 32-8 at 17, 39, 45–46.

At ARI, Tobacco was one of three persons in similar manager positions; the other two managers were located in Rapid City and Sioux Falls, respectively. Docket 31 ¶ 6. Tobacco's salary was paid for primarily by non-grant funds, while the salaries for the other two managers were primarily paid for by grant money. Docket 31 ¶ 7. ARI contends that the lower number of grants related to the Pine Ridge location, versus Rapid City and Sioux Falls, resulted in Tobacco's salary coming from internal funds. *Id.*

In 2020, Dr. Arielle Deutsch joined ARI's staff as a research scientist, and ARI undertook a study that was the primary focus of Dr. Deutsch's work before coming to ARI—the SYNCH study. Docket 30 ¶ 36. Relevant here, the SYNCH study team included Dr. Deutsch, Rebecca Andrews, Nick Palko, Kiley Medler, Tobacco, and Paul Forney. *Id.* ¶ 37. Dr. Deutsch, Andrews, Palko, and Medler worked out of the Rapid City office. *Id.* Dr. Deutsch was the principal investigator. Docket 32-1 at 70. Andrews was the lead and supervised Palko and Medler, who were part-time research assistants. Docket 32-3 at 9, 25; Docket 22-1 at 99. Andrews also worked on other projects and supervised other employees. Docket 22-1 at 99. Christy Hockett supervised Andrews. Docket 30 ¶ 18; Docket 22-1 at 96. Jyoti Angal, a director of community-based research, supervised Tobacco. Docket 30 ¶ 18. Tobacco supervised one

employee, Forney, at the Pine Ridge office. Docket 31 ¶ 8; Docket 22-3 at 138. Tobacco and Forney were the only Native Americans on the SYNCH study team. Docket 24 at 16; Docket 30 ¶ 38. Tobacco highlights her 2021 performance review, wherein Angal commented that "Deb is a tremendous asset [to] the CPRC team. In the upcoming year, the focus is on identifying ways for Deb to take a larger role in scientific development of projects, and also increase regional presence." Docket 30 ¶ 28.

As it pertains to the SYNCH study, Tobacco notes that "the ARI Rapid City team members and the Pine Ridge staff were assigned to recruit specific numbers of participants from Pine Ridge and Rapid City[.]" Docket 30 ¶ 39. But, according to Tobacco, the Rapid City office had problems with participant recruitment in early 2022, and as a result, Forney was directed to drive to Rapid City to conduct participant recruitment in Rapid City. Docket 30 ¶¶ 41–42; Docket 32-1 at 73–74. Tobacco contends she did not know he was being assigned to work elsewhere, and this frustrated her. Docket 32-1 at 73–75.

Eventually, Dr. Deutsch and Dr. Elliott decided that both Tobacco and Forney would assist with the SYNCH study in Rapid City. Docket 24 at 16; Docket 31 ¶ 26. According to ARI, "[t]his was because there was not much left to do with the SYNCH project at the Pine Ridge location, and there was a lot more to be done in Rapid City." Docket 24 at 16.

Tobacco was assigned to replace Andrews as the lead on the SYNCH study. Docket 31 ¶ 27. ARI asserts that this was done "to redistribute the work to better align with the projects that ARI had at different sites[.]" Docket 24 at

16. While the lead is responsible for directing the SYNCH study's work, Docket 31 ¶ 28, being a lead on a project does not involve increased pay or benefits, *Id.* ¶ 23. There is also no job description for a lead. Docket 32-1 at 66. However, Tobacco appreciated the nonmonetary value of being the lead, specifically the "educational challenge, the professional networking with colleagues, and the fulfillment of doing work that helps others." Docket 31 ¶ 23.

As the lead on the SYNCH study, Tobacco understood from Dr. Deutsch that participant recruitment was the priority. Docket 30 ¶ 47; Docket 32-1 at 81. She thus directed the Rapid City part-time research assistants, Palko and Medler, to conduct door-to-door participant recruitment, but they declined to do so because of their concern for their safety due to the recent reports of violence, including a shooting, in Rapid City. Docket 30 ¶ 47; Docket 31 ¶ 28; Docket 32-1 at 99; Docket 32-3 at 18, 25. Tobacco offered for them to join her and Forney in Pine Ridge to conduct this type of recruitment to become more comfortable. Docket 30 ¶ 49; Docket 32-2 at 24. They declined. *Id.* They also declined Tobacco's suggestion that their fears could be lessened if ARI provided self-defense training. Docket 30 ¶ 48; Docket 32-3 at 25.

Tobacco confirmed that she had the authority to direct Palko and Medler to conduct door-to-door recruitment. Docket 30 ¶ 54. However, Palko and Medler continued to refuse, which to Tobacco, "felt like chaos." Docket 30 ¶ 67; Docket 32-1 at 73. She and Forney "were frustrated with the fact that Forney was having to drive to Rapid City to do Palko and Melder's work." Docket 30 ¶ 71; Docket 32-2 at 11–12. They felt like it was unfair that Palko and Medler

5

could ignore their work assignments. Docket 30 ¶ 72; Docket 32-2 at 11–12, 19. "Forney told Tobacco that he felt like ARI was treating them like 'token Indians' for the SYNCH project." Docket 30 ¶ 73; Docket 32-2 at 16.

On March 22, 2022, during a meeting, Tobacco and Dr. Deutsch discussed "systemic race discrimination against Native people in Rapid City, weak efforts at DEI training, and their respective personal struggles with how to talk about race discrimination in the SYNCH team setting." Docket 30 ¶ 52; *see generally* Docket 32-14. They also discussed discriminatory microaggressions. Docket 32-14 at 7–10. Tobacco raised her concern that Palko and Medler were not recruiting participants and suggested it might be because of microaggressions and discriminatory feelings, though she did not state that these microaggressions were toward her in particular. *Id.* at 9, 16. She expressed disappointment that her colleagues "weren't available to be there with [her] in the sense that – the purpose that [she] was there trying to help them with." *Id.* at 8. She also told Dr. Deutsch that she was finding the ARI workplace to be difficult, and she expressed concerns with speaking up about the microaggressions because she did not know if it would make things worse. *Id.* at 20, 23. Dr. Deutsch left this conversation believing Tobacco was talking about systemic racism, not racism at ARI. Docket 30 ¶ 53; Docket 32-4 at 42, 44.

At some point after this meeting, Tobacco directly asked Palko and Medler at a SYNCH team meeting about why they are not going into the Native American communities. Docket 30 ¶ 77; Docket 32-1 at 99. They replied that

6

they were afraid because of the recent shootings in Rapid City. Docket 30 ¶ 77; Docket 32-1 at 99. After listening to them, Tobacco then specifically asked her supervisor and Andrews why it is okay for her and Forney to do the job Palko and Medler were afraid of doing—going out in that dangerous community. Docket 30 ¶ 77; Docket 32-1 at 99. Tobacco claims she told them that it is discriminatory and "outright racist." Docket 30 ¶ 77; Docket 32-1 at 99. Tobacco contends she did not receive a response to her question from her supervisor or Andrews. Docket 30 ¶ 77; Docket 32-1 at 100.

Tobacco claims that around April 2022, she requested that Fredrick mediate a meeting between her and leadership because she felt discriminated against based on her race. Docket 32-1 at 23; Docket 30 ¶ 64. The discrimination, Tobacco contends, occurred when Angal instructed Tobacco to obtain a signature by an Oglala Sioux tribal leader on a letter of support for a pending ARI grant. Docket 32-1 at 25; Docket 30 ¶ 65. Angal allegedly directed her to get anyone off the street to sign the support letter and threatened Tobacco with reprimand when she indicated she did not believe she could obtain the signature. Docket 31-1 at 25; Docket 30 ¶ 65.

Frederick took notes documenting Tobacco's mediation request and complaint. Docket 32-16. The notes do not reflect that Tobacco made a complaint based on race. *Id.* Rather, the notes indicate that Fredrick attended a meeting with Dr. Elliott, Angal, Hockett, and Tobacco on April 19, 2022 that "centered around" a grant and Tobacco's "involvement in not supporting the grant and the reasons[] why she did not support that grant." *Id.* Fredrick's

7

notes also relate that Tobacco "was confused on her involvement as a leader at Avera as well as on the Tribal Council IRB" and that she would like leadership to clarify her leadership role. *Id.*

Tobacco disagrees with Fredrick's representation of the meeting, claiming that Hockett's deposition testimony reflects "that they wanted HR involved because of Tobacco's expression of being tokenized as a Native American." Docket 30 ¶ 66. But in her deposition, Hockett was asked whether Tobacco asked HR to become involved "because she was upset about being tokenized as a Native American person," and Hockett answered, "I don't know." Docket 32-6 at 87. She then replied "No" when asked whether she "recall[ed] the word being a token or being tokenized" come up at a meeting. *Id.*

However, Palko testified about racism being brought up in SYNCH team meetings. Docket 32-3 at 30. He was asked if he would agree "that the Native American members of [his] team brought up that they felt that racism was a problem with the SYNCH recruitment[.]" *Id.* He replied, "I remember, I even brought that we had to be careful of racism in recruitment, that we would have to be mindful of perceptions of racism[,]" and in regard to this meeting, he further recalled that they "talked about tokenization and [he] remember[s] Deb expressing she had concerns she was being tokenized" when he discussed his concern about people feeling tokenized in the recruitment. *Id.* at 30–31; *see also* Docket 30 ¶ 57. Nothing happened at the meeting in response to her comment, but Palko and Medler reported to Andrews "that Deb said that she felt tokenized in the study." Docket 32-3 at 33; Docket 30 ¶¶ 58–60; Docket 32-

5 at 48–49. As far as Palko was aware, Andrews did not report Tobacco's statement to HR. Docket 32-3 at 34.

On June 3, 2022, Tobacco sent an email to Angal, Dr. Deutsch, and Andrews about Palko's and Medler's work assignments compared to Forney's. Docket 30 ¶ 84; Docket 32-18. This email came after Dr. Deutsch explained to Tobacco that Forney would be doing recruitment via Zoom, so he did not have to drive to Rapid City. Docket 30 ¶ 84; Docket 32-4 at 66. Fredrick received the email, but according to Tobacco, Fredrick did not ask Tobacco about her complaint that the distribution of labor was unfair for Forney. Docket 30 ¶¶ 84–85; Docket 32-18; Docket 32-5 at 117.

On June 9, 2022, Tobacco sent an email to Frederick alleging that she was being retaliated against and that she is continually meeting resistance in her recruitment plan in the Rapid City office. Docket 30 ¶ 89; Docket 32-20. Frederick met with Tobacco on June 14, and in her notes from that meeting, Fredrick relates Tobacco's complaints about the unfair workload, dismissive conduct by Andrews, Palko, and Medler, and Tobacco feeling isolated by the SYNCH team. Docket 30 ¶ 90; Docket 32-21. Fredrick met again with Tobacco on June 22, 2022, and her notes indicate that she told Tobacco "that based on the information that was provided by [Tobacco] and her leadership [Fredrick] feels there has not been retaliation from the RC Team or leadership." Docket 32-22. Her notes also acknowledge the tension with the Rapid City office, but Fredrick opines in her notes that "[t]eam leaders and RC employees felt they were not being heard which eroded at their relationship" out of "frustration"

9

and "not retaliation." *Id.* Fredrick's notes advise Tobacco that she could reach out if additional concerns arise. *Id.*

On June 1, 2022, Dr. Elliott was told that ARI needs to show a 5% improvement in its budget, either by reducing expenses by 5% or by increasing revenue by 5%, in light of a mandate by Avera McKennan's CEO that department leaders improve their respective budgets by 5%. Docket 32-17; Docket 32-8 at 112. Tobacco claims that Avera did not direct Dr. Elliott on how she should achieve this budget improvement, and thus, Dr. Elliott had discretion in how she met the directive. Docket 32-5 at 28, 34, 36.

Nevertheless, it is undisputed that Dr. Elliott presented information about the budget issue to the ARI administrative group during a meeting on June 6, 2022, and determined that ARI would reduce its budget by 5%. Docket 32-19; Docket 32-8 at 112. Tobacco claims she was excluded from this meeting and that Angal was supposed to give her the relevant information after the meeting. Docket 32-1 at 44, 49; Docket 32-8 at 112–13. But no one at ARI talked to Tobacco about the budget improvement information, and although her fellow ARI administrative peers were informed, she claims she was not. Docket 32-8 at 113; Docket 32-1 at 49.

Ultimately, Dr. Elliott decided to eliminate Tobacco's position as part of a reduction in force (RIF) to meet the required 5% budget improvement. Docket 30 ¶ 99; Docket 32-8 at 57; Docket 32-5 at 36. Dr. Elliott testified that she did not know specifically how much money was needed to reduce the ARI budget by 5% but that her supervisor had determined that the RIF was meeting the

budget requirement. Docket 32-8 at 90, 102. Fredrick told Dr. Elliott that she needed to follow Avera's RIF policy. Docket 30 ¶ 101; Docket 32-8 at 55; Docket 32-5 at 74. Dr. Elliot testified that although she did not review the policy herself, HR had the policy and Fredrick assisted her. Docket 32-8 at 57–58.

On June 29, 2022, Dr. Elliott's supervisor approved the recommendation that Tobacco's position be terminated as part of a RIF. Docket 32-23. In an email, Dr. Elliott explained that the decision was based on "limited grant dollars for the one project at this location" and that "[t]here is only [one full-time employee] and we just don't need a manager at that site." *Id.* Thereafter, on July 5, 2022, ARI terminated Tobacco's employment as part of the RIF. Docket 30 ¶ 116; Docket 32-1 at 49–50. Tobacco claims that when she was terminated, she mentioned discrimination and asked Frederick if her termination was retaliation because of "their unhappiness with [her] that [she] refused to be tokenized[.]" Docket 32-1 at 50. She also asserts she asked Fredrick if it was discrimination based on her reporting the racism. *Id.* at 50–51. According to Tobacco, Fredrick replied that her termination "was due to budgetary constraints." *Id.*

Tobacco was offered a severance package (10 weeks) and not given a different position within ARI because Dr. Elliott determined that the open positions would be demotions, for less pay, and in locations other than Pine Ridge and that "the best course of action" would be to offer her the severance with eligibility for her to apply for open positions at ARI. Docket 32-8 at 51–52,

11

59, 61, 67. At her termination, Tobacco was told that there were open positions within Avera McKenna for which she could apply. Docket 30 ¶ 140; Docket 32-8 at 59, 65, 69, 91; Docket 32-5 at 77–78.

Following her termination, Tobacco filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the South Dakota Division of Human Rights (SDDHR), alleging discrimination based on her race. Docket 1 ¶ 9; Docket 32-34. The EEOC issued Tobacco a right to sue notice on February 27, 2023, and the next day, the SDDHR closed its agency file on the matter. Docket 1 ¶ 10. On May 22, 2023, Tobacco filed this lawsuit, alleging one count of race discrimination in violation of Title VII of the Civil Rights Act of 1964 and one count of race and national origin discrimination in violation of the South Dakota Human Relations Act (SDHRA). Docket 1.

On December 02, 2024, ARI moved for summary judgment, seeking dismissal of Tobacco's claims. Docket 20. Tobacco opposes the motion. Docket 29.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law." *NDN Collective v. Retsel Corp.*, 5:22-CV-5027, 2024 WL 3903975, at *2 (D.S.D. Aug. 22, 2024) (citations omitted). "The moving party can meet this burden by presenting evidence that

there is no dispute of material fact or by showing that the nonmoving party has not presented evidence sufficient to support an element of its case on which it bears the ultimate burden of proof." *Id.* (citation omitted). "Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must present facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *S. Black Hills Water Sys., Inc. v. Town of Hermosa*, 5:21-CV-05070-VLD, 2023 WL 4824956, at *4 (D.S.D. July 27, 2023) (citations omitted). The Court will "review the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." *Musolf*, 773 F.3d at 918 (citation omitted).

## DISCUSSION

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). South Dakota law, under the SDHRA, likewise makes it "an unfair or discriminatory practice for any person, because of race . . . or national origin, . . . to discharge an employee, or to accord adverse or unequal treatment to any . . . employee . . . with respect to . . . any term or condition of employment." SDCL § 20-13-10. The parties agree that Tobacco's claims brought pursuant to Title VII and under the SDHRA can be analyzed together because they implicate the same

13

legal standards and rely on the same factual allegations. Docket 24 at 7; Docket 29 at 13 n.5. *See also Axness v. Aqreva LLC,* 118 F. Supp. 3d 1144, 1157–58 (D.S.D. 2015) (combining the analysis of the state law and federal claims because they "hinge on the same factual allegations" and "South Dakota courts examine claims under SDCL § 20-13-10 under a standard identical to that applied to Title VII claims").

The parties also agree that because Tobacco lacks direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to the question whether her claims of discrimination in her employment and in her termination survive summary judgment. Docket 29 at 11; Docket 24 at 8. *See also Axness,* 118 F. Supp. 3d at 1164.

> Under this framework, if an employee carries [the] burden of establishing a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03 (1973). If the employer meets this burden of production, the employee must then "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, (2000).

*Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016).

## I.    Prima Facie Case

To make a prima facie case of discrimination as it relates to terms and conditions of employment, an employee "must show that she is a member of a protected group, was meeting the legitimate expectations of her employer, and suffered an adverse employment action under circumstances permitting an

14

inference of discrimination." *Pilot v. Duffy*, 143 F.4th 924, 928 (8th Cir. 2025) (cleaned up). When discrimination is alleged in the context of a RIF, the employee "must meet the first three requirements and must come forward with additional . . . evidence that [race] was a factor in [her] termination." *Bashara v. Black Hills Corp.*, 26 F.3d 820, 823 (8th Cir. 1994) (citation and internal quotation marks omitted); *see Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 483–84 (8th Cir. 1997) (noting that the Title VII analysis is adapted for RIF claims).

ARI does not dispute that Tobacco is within a protected class, that she met the applicable job qualifications, and that she was discharged. Docket 24 at 10; Docket 29 at 13. However, ARI claims that Tobacco has failed to show an adverse employment action in regard to terms and conditions of employment. Docket 38 at 23. ARI further contends, as it pertains to all allegations of discrimination, that summary judgment is appropriate because Tobacco did not present evidence establishing that her race was a factor in her termination, Docket 24 at 10; Docket 38 at 11–12, and did not present evidence supporting an inference of race discrimination, Docket 24 at 12; Docket 38 at 23.

In response, Tobacco first addresses her claim of race discrimination in her termination. Docket 29 at 12. She contends that the totality of circumstances surrounding her employment at ARI evince that race was a factor in her termination. *See generally* Docket 29. She notes the different treatment she (and Forney, the only other Native American on the SYNCH study team) experienced as compared to Palko and Medler (two white SYNCH

15

study part-time employees) in relation to the workload for the SYNCH study and the different treatment she experienced by her co-workers and managers. *Id.* at 14–16. According to Tobacco, she "struggled to imagine any other reason" for this treatment than "racial bias." *Id.* at 14.

Tobacco also notes the frustrations she experienced as the lead on the SYNCH study because neither Dr. Deutsch nor the Rapid City SYNCH team members treated her with the same respect as they treated Andrews and that Andrews, who was no longer the lead, "was ultimately able to get Deutsch to adopt her recommendations about how to conduct SYNCH recruitment in Rapid City[.]" *Id.* at 14, 16. Tobacco's frustrations left her with "a feeling of chaos" because she could not "conduct her functions as a manager or [ ] control the schedule of work in the office she was managing[.]" *Id.* at 15. Additionally, in her view, her treatment compared to Andrews "suggest[s] that there was bias at work." *Id.* at 17.

Further, Tobacco claims that she, the only Native American manager, was excluded from meetings that other ARI administrators, like Andrews, were invited to attend. *Id.* She also contends that although her supervisor, Angal, was supposed to relay information from the meetings to her, she was not given pertinent information. *Id.* Particularly troubling, in Tobacco's view, was her lack of awareness that a meeting discussed ARI needing to make a 5% budget adjustment, information she was not told about prior to her receiving the call terminating her employment. *Id.* According to Tobacco, "[t]his curious lack of communication about an obviously major financial issue underscores the

16

professional and career-advancement value in being invited to ARI's administrator meetings, and . . . should support a reasonable inference of discrimination." *Id.*

Finally, Tobacco asserts that her "efforts to talk about being treated differently because of her race went unacknowledged by ARI managers[.]" *Id.* at 15. She emphasizes that she told Palko and Medler that she felt tokenized. *Id.* Although Palko and Medler reported this information to Andrews, Andrews did not thereafter report this information to HR; rather, according to Tobacco, Andrews "decided to report Tobacco for creating a hostile work enforcement for" Palko and Medler by Tobacco pushing for them to conduct door-to-door recruitment despite their safety concerns. *Id.* According to Tobacco, she "began to be typecast as a careless leader who would not listen[,]" while "Palko and Medler were getting preferential treatment and lesser workloads." *Id.* at 16. She further claims that "racial bias was the reason for the unequal and unfair treatment that [she] experienced[.]" *Id.* at 18.

Relying on the above allegations and her view that her complaints about "workplace racism" occurred in close proximity to her termination, Tobacco argues that she "is entitled to the inference that her race played a role in the decision to terminate her position." *Id.* She further claims that her allegations support an inference of race discrimination in her terms and conditions of employment because they establish she suffered an adverse employment actions by being "worse off" in terms of her ability to control her schedule and supervise employees; the hours "wasted on travel instead of study and work

17

progress as she tried to address her workplace inequities"; her loss of "the well of collegiality and professional networking connections she had built with other ARI researchers over a career[.]" *Id.* at 25–29.

The United States Supreme Court has explained that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). "The required prima facie showing is a 'flexible evidentiary standard[.]'" *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (citation omitted). "The touchstone inquiry remains whether circumstances permit a reasonable inference of discrimination." *Lewis v. Heartland Inns of Am., LLC*, 591 F.3d 1033, 1040 (8th Cir. 2010). However, the employee must provide more than speculation to support a claim that race caused the adverse employment action. *See Condron v. McKennan*, 4:21-CV-04135-RAL, 2023 WL 6388014, at *6 (D.S.D. Sept. 29, 2023).

Taking Tobacco's allegations as true and drawing all reasonable inferences in her favor, the Court determines that she has not met her burden of alleging sufficient facts to raise an inference of race discrimination in her terms and conditions of employment or that race was a factor in her termination. The Court acknowledges that Tobacco felt disrespected and frustrated as the lead on the SYNCH study; that Andrews seemingly thwarted her efforts to make the study successful; that ARI managers were not remedying the issues in the way Tobacco desired; and that she was excluded

18

from a critical ARI management meeting related to the 5% budget adjustment. The Court also considers that Tobacco conducted door-to-door recruitment, a proven successful way to obtain participants, while Palko and Medler were allowed to refrain from doing so and that Tobacco commented to Palko and Medler that she felt tokenized.

However, it is well settled that to avoid summary judgment, Tobacco must substantiate her allegations with probative evidence. *See Musolf*, 773 F.3d at 918. This she has not done. First, besides her conclusory assertions, Tobacco has not presented evidence that her treatment at ARI was due to her race. Rather, she asks this Court to presume that race was a motivating factor behind ARI's decisions because she personally cannot fathom a different reason. Further, while the evidence supports that she conducted door-to-door recruitment when Palko and Melder were excused from doing so, the record is devoid of evidence that she was forced to conduct such type of recruitment because of her race rather than because of her preference for or willingness to do that type of recruiting. Finally, Tobacco's statement to Palko and Medler about feeling tokenized does not state a prima facie case of race discrimination because there is no evidence linking that statement to Tobacco's termination or to her terms and conditions of employment.[2]

---

[2] In her argument related to pretext, Tobacco contends that her "termination creates an inference of discrimination, as it occurred within approximately a month after [she] confronted her supervisors about outright racism, and less than a month after she asserted two complaints to HR about Forney's unfair treatment and about retaliation against her." Docket 29 at 23. The Court notes that Tobacco did not bring a claim for retaliation under 42 U.S.C. § 20003-3(a). Even so, Tobacco has not directed the Court to record evidence to support these allegations, and the Court's own examination of

Because Tobacco has failed to substantiate her allegations of race discrimination with evidence that would permit a finding in her favor, the Court concludes that she has not established a prima facie case of race discrimination. However, for the reasons explained below, even if Tobacco made the requisite showing, ARI would nonetheless be entitled to summary judgment because it is undisputed that ARI articulated a legitimate, nondiscriminatory reason for Tobacco's termination, and she has not presented sufficient evidence to create a genuine issue of material fact that ARI's articulated reasons were merely pretextual for race discrimination.[3]

## II.    Pretext

"There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Shaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011)). The "plaintiff may show that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact[,]'" or pretext may be shown "by persuading the court that a [prohibited] reason more likely motivated the employer." *Torgerson*, 643 F.3d at 1047 (citation omitted). This second path "includes things like an employer failing to follow its own policies, treating similarly situated employees differently, or shifting its

---

Tobacco's emails and statements does not reveal an inference that race was a factor in her termination or terms and conditions of employment.

[3] Tobacco concedes that a RIF in response to budget constraints is a legitimate, nondiscriminatory reason for a termination. Docket 29 at 18. And she does not otherwise suggest that ARI failed to articulate legitimate, nondiscriminatory reasons for its treatment of Tobacco in relation to her terms and conditions of employment.

explanation for the employment decision." *Pilot*, 143 F.4th at 929 (citing *Lake v. Yellow Transp., Inc.,* 596 F.3d 871, 874 (8th Cir. 2010)).

Importantly, "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 916 (8th Cir. 2007) (citation omitted). Also, although a less onerous showing is required to make a prima facie case, "more substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the employer's] legitimate, non-discriminatory explanation." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 992 (8th Cir. 2006) (citation omitted). Finally, "[w]hen a company exercises its business judgment in deciding to reduce its work force, it need not provide evidence of financial distress to make it a legitimate RIF." *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 833 (8th Cir. 2020) (alteration in original) (quoting *Rahlf v. Mo-Tech Corp.*, 642 F.3d 633, 639 (8th Cir. 2011)).

Tobacco contends that "[t]he deferential approach to reduction in force decisions . . . makes a reduction in force an inviting vehicle to mask unlawful discrimination." Docket 29 at 19. Tobacco then argues that ARI used the "RIF to disguise discriminatory motive" because it lied about being mandated to make a 5% *reduction* in its budget; Dr. Elliott did not perform any budget calculations to determine if a RIF was appropriate; Dr. Elliott did not review or

21

comply with Avera's RIF policy; and ARI "skipped over transition services and settled upon severance" when terminating Tobacco. *Id.* at 19–25. The Court addresses each argument.

ARI's statement of undisputed material facts contains allegations that Avera's CEO directed "department leaders to reduce their respective budgets by five percent" and that Dr. Elliott "was given a directive by her supervisor to reduce ARI's budget by five percent[.]" Docket 21 ¶¶ 10, 11. But ARI's summary judgment brief recognizes that Dr. Elliott was directed to *either* increase ARI's revenue by 5% *or* reduce ARI's budget by the same. *See* Docket 38 at 13. Therefore, contrary to Tobacco's view, the incomplete statement of undisputed material fact does not establish that ARI lied or that it is shifting its explanation for the RIF. Indeed, as Tobacco testified, when she was terminated, she was told that it was due to budget constraints, and this is the same reason ARI advances in defense of Tobacco's lawsuit.

However, Tobacco further suggests that the RIF was pretextual because ARI could have achieved the 5% budget adjustment by *increasing* its revenue by 5%, pointing this Court to evidence that ARI's income revenue increased in fiscal years 2022 and 2023. Docket 29 at 21. Setting aside that this Court does not "review[] the wisdom or fairness of the business judgments made by employers," *Gilbert*, 495 F.3d at 916, Tobacco's broad and conclusory assertion that ARI could have, in her view, avoided the RIF is not tethered to evidence that the RIF decision itself is unworthy of credence.

For a similar reason, the Court concludes that Dr. Elliott's decision not to perform specific budget calculations prior to deciding to terminate Tobacco's position is insufficient to show that ARI's decision to terminate Tobacco as part of a RIF lacks a basis in fact. Even assuming that a budget calculation would have revealed to Dr. Elliott that the RIF did not achieve a 5% reduction in ARI's budget or revealed something worse budget-wise, "[e]mployers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices." *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 720 (8th Cir. 2008) (citation omitted) (alteration in original).

Finally, even accepting as true that Dr. Elliott did not comply with certain provisions or guiding principles in Avera's RIF policy and should have offered Tobacco transitions services rather than severance, Tobacco has not shown that her race was a factor behind ARI's decisions. "Evidence showing an employer has failed to follow its own policies may indicate pretext, yet an employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee as long as it does not unlawfully discriminate in doing so." *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1126–27 (8th Cir. 2017) (cleaned up); *see also Morris v. Dept. of Veterans Affs.*, 119 F.4th 536, 538 (8th Cir. 2024) (noting that the employee must show a causal connection between her protected characteristic and the employer's decision).

It is undisputed that Tobacco's position was one of the only positions at ARI that was largely funded by internal money, and Dr. Elliott determined that eliminating Tobacco's position as part of a RIF would meet the 5% budget adjustment required by Avera. Docket 32-8 at 57. Dr. Elliott testified that she was aware of where ARI's internal dollars were allocated and that she considered the limited grant dollars available at the Pine Ridge location and that Tobacco only supervised one person at that site. Docket 32-23; Docket 32-8 at 57, 90. She also consulted with her supervisor, the Vice President of Avera Research. Docket 22-3 at 138. Notably, Tobacco does not allege that any similarly situated employee not in her protected class was treated differently.

In regard to Tobacco's claim of discrimination in her terms and conditions of employment, the Court notes that she does not specifically contend that ARI's reasons for the alleged disparate treatment were pretextual. *See* Docket 29 at 25–29. Rather, her allegations of pretext in her complaint relate to her termination, Docket 1 ¶¶ 77, 85, as do her arguments in her brief opposing summary judgment, Docket 29. Nevertheless, the Court reviewed the record evidence and concludes that Tobacco has neither rebutted the factual basis underlying ARI's proffered explanations, nor shown that her race more likely motivated the action—the showing required to establish an independent claim of race discrimination in her terms and conditions of employment. *See Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (noting the plaintiff's failure to point to evidence).

24

**CONCLUSION**

For the reasons stated above, ARI is entitled to summary judgment on Tobacco's claims brought pursuant to Title VII and under the SDHRA. Accordingly, it is hereby

ORDERED that Defendant's motion for summary judgement, Docket 20, is granted. It is further

ORDERED that Tobacco's complaint, Docket 1, is dismissed with prejudice.

Dated September 3, 2025.

BY THE COURT:

/s/ *Camela C. Theeler*
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE